LARRY R. MARTIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3190–65. Filed April 15, 1968.

*Frederick J. Conroy*, for the petitioner.
*J. Frost Walker, Jr.*, for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a deficiency of $1,282 in petitoiner's income tax for 1962. Petitioner is an auroral physicist, who was stationed in Antarctica during all of 1962, and his total 1962 income of $7,000 represented earnings from services in that area. He claims that such earnings were exempt from tax under section 911(a)(2),[1] and the only question raised in this respect is whether Antarctica is a "foreign country" within the meaning of those provisions. There is no dispute that petitioner otherwise qualifies for the exemption. The facts have been stipulated.

At the time the petition herein was filed, petitioner resided in Wellesley, Mass. He filed his income tax return for 1962 with the district director of internal revenue in Cincinnati, Ohio.

At least from October 29, 1961, through March 26, 1963, petitioner was employed by the Artic Institute of North America, a private tax-exempt U.S. organization. During this period and as an employee of this organization, he took part in an Antarctic expedition. He arrived in New Zealand on October 29, 1961, where he remained some 5 days, and on November 4, 1961, he arrived in Antarctica. He remained in Antarctica until January 31, 1963, when he departed for New Zealand, where he stayed until March 26, 1963, and then returned to the United States on that day. His address in Antarctica was "Byrd Station, Antarctica."

Antarctica is a region comprised of land area, permanent ice sheets, and adjacent waters located about the South Pole. There is no single soverign nation governing the region of Antarctica.

Effective June 23, 1961, the United States and a number of other nations entered into a treaty regarding Antarctica. 12 U.S.T. 794. Prior to the treaty, seven of the signatory nations (Argentina, Australia, Chile, France, New Zealand, Norway, and the United King-

---

[1] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle :

\* \* \* \* \* \* \*

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. \* \* \*

dom) had laid claims to certain portions of the Antarctic continent, but no nation appears to have asserted any claims of sovereignty to the area containing Byrd Station where the United States has engaged in various scientific activities. The United States had never asserted any claims of sovereignty over any part of Antarctica, nor had it recognized the claims of any other nation.[2] Since the effective date of the treaty the Department of State does not consider the Antarctica region to be under the sovereignty of any government; also since that date it has consistently held that Antarctica has no territorial waters and that the waters surrounding the Antarctica land area and ice sheets are part of the high seas.

The treaty appears to be an outgrowth of the cooperative efforts of various nations of the world in respect of scientific exploration of Antarctica during the International Geophysical Year, 1957–58. It was signed on December 1, 1959, not only on behalf of the seven claimant nations listed above but also on behalf of the United States, Belgium, Japan, the Union of South Africa, and the Union of Soviet Socialist Republics. As already noted, it became effective June 23, 1961.

In general, the treaty provides that Antarctica is to be used for peaceful purposes only, encouraging cooperation in scientific investigation, and putting in abeyance at least during the period of the treaty (30 years) all questions of sovereignty. In respect of the latter, article IV of the treaty provides as follows:

1. Nothing contained in the present Treaty shall be interpreted as:

(a) a renunciation by any Contracting Party of previously asserted rights of or claims to territorial sovereignty in Antarctica;

(b) a renunciation or diminution by any Contracting Party of any basis of claim to territorial sovereignty in Antarctica which it may have whether as a result of its activities or those of its nationals in Antarctica, or otherwise;

(c) prejudicing the position of any Contracting Party as regards its recognition or non-recognition of any other State's right of or claim or basis of claim to territorial sovereignty in Antarctica.

2. No acts or activities taking place while the present Treaty is in force shall constitute a basis for asserting, supporting or denying a claim to territorial sovereignty in Antarctica or create any rights of sovereignty in Antarctica. No new claim, or enlargement of an existing claim, to territorial sovereignty in Antarctica shall be asserted while the present Treaty is in force.

Although represented by counsel, petitioner has not filed any brief or otherwise indicated the basis for his position in this case. We hold that Antarctica is not a "foreign country" within the meaning of section 911(a)(2).

---

[2] The statements in this paragraph regarding the legal claims of various nations are subject to judicial notice, and an account thereof may conveniently be found in 2 Encyclopaedia Britannica 5 et seq. (1967 ed.). The position of the State Department set forth in this paragraph has been stipulated by the parties.

Section 1.911–1(b) (7), Income Tax Regs., defines "foreign country" as used in these provisions as follows:

The term "foreign country" means territory under the sovereignty of a government other than that of the United States and includes the air space over such territory. It does not include a possession or Territory of the United States.

Antarctica plainly does not fall within these terms. The parties have stipulated that "the Department of State does not consider the Antarctica region * * * to be under the sovereignty of any government," and it is well established that in matters of foreign affairs generally and in determinations of sovereignty in particular, the courts must accept the position taken by the executive branch. *Frank Souza*, 33 T.C. 817, 822–823. Moreover, even apart from the claims of some nations to portions of Antarctica, the area which may be referred to as the United States sector (which contains Byrd Station) does not appear to be claimed by any government. Accordingly, it is clear that neither Antarctica as a whole, nor that portion containing Byrd Station, is a "foreign country" within the meaning of the regulations. See Rev. Rul. 67–52, 1967–1 C.B. 186.

The regulations represent a reasonable interpretation of section 911(a) (2). They are certainly consistent with the language of the statute, and we know of nothing in the legislative history that would require a different construction. In the circumstances we follow the long-standing rule that regulations must be treated as valid unless unreasonable or plainly inconsistent with the statute, and that they should not be set aside except for weighty reasons. *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501; *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378; *Boske* v. *Comingore*, 177 U.S. 459, 470; *Brewster* v. *Gage*, 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326, 336–339; *Colgate Co.* v. *United States*, 320 U.S. 422, 426.

The result that we reach is in accord with *Frank Souza, supra*, where the taxpayer, a captain of a fishing vessel, maintained a hotel room in Peru and fished in Peruvian coastal waters within 200 miles of the Peruvian coastline. Although the Peruvian Government claimed sovereignty to a distance of 200 miles from its coast, such claim was not recognized by the United States beyond the first 3 miles. Accordingly, we there held that the taxpayer was not physically present within the territorial limits of Peru for purposes of section 911(a) (2) when he was fishing more than 3 miles from the coastline, notwithstanding that the Peruvian Government enforced its claim by confiscating fishing vessels operating within the 200-mile area that did not have a Peruvian permit. The present case is an even weaker one for the petitioner. Cf. *William M. Bebb*, 36 T.C. 170.

*Decision will be entered for the respondent.*